LEHTINEN, EXR., APPELLEE, *v.* DRS. LEHTINEN, MERVART & WEST, INC. ET AL., APPELLANTS.

[Cite as *Lehtinen v. Drs. Lehtinen, Mervart & West, Inc.,* 99 Ohio St.3d 69, 2003-Ohio-2574.]

(No. 2002–0227—Submitted February 12, 2003—Decided June 4, 2003.)

**ALICE ROBIE RESNICK, J.**

{¶ 1} This is an appeal from the reversal of a summary judgment that barred an executor who was not a member of the decedent's profession from acquiring the decedent's shares in a professional association.

{¶ 2} In 1996, David E. Lehtinen, M.D., and defendants-appellants Michael Mervart, M.D., and Michael West, M.D., all of whom were neurosurgeons, organized as a professional association under the name of Drs. Lehtinen, Mervart and West, Inc. ("Association"). The parties agree that the Association, also an appellant, was organized under the Professional Association Act, R.C. Chapter 1785, for the sole purpose of rendering medical services. Each physician owned one-third of the Association's stock.

{¶ 3} Dr. Lehtinen died testate on December 28, 1997. It is undisputed that at the time of Dr. Lehtinen's death, no provision existed in the Association's articles of incorporation or in any other document to govern the disposition of a deceased shareholder's shares. Plaintiff-appellee, Patricia J. Lehtinen, is Dr. Lehtinen's surviving spouse and the executor of his estate. Appellee is not a licensed physician.

{¶ 4} In the aftermath of Dr. Lehtinen's death, Dr. Mervart assured appellee that she would receive fair compensation for her late husband's interest in the Association. To that end, a financial evaluation of the corporation was prepared by the Association's accountant and presented at a shareholder's meeting held on January 16, 1998. According to the minutes of that meeting, it was the accountant's opinion that "the present fair market value of Dr. Lehtinen's interest was between $70,000 to $75,000." Also according to the minutes, it was decided that for the immediate future Drs. Mervart and West would draw only their normal salaries from the Association and that "[e]xcess funds would be accumulated and disbursed to Pat Lehtinen towards the corporation buy-out of Dr.

Lehtinen's interest." Three weeks later, the Association's accountant met with appellee and informed her of these decisions.

{¶ 5} This plan was never implemented, however, and neither the Association nor Drs. Mervart and West made any payments to appellee toward the purchase of Dr. Lehtinen's interest. According to Dr. Mervart, the corporate officers were advised that "we were legally unable to disburse the assets of the corporation until [certain malpractice] lawsuits [that were pending against the Association] had been settled." Thus, "we were unable to [buy out Dr. Lehtinen's interest]."

{¶ 6} Drs. Mervart and West continued to practice under the Association's existing corporate name. In the Association's 1998 annual report to the Secretary of State, Dr. Mervart certified that as of June 30, 1998, all of the Association's shareholders, including "David E. Lehtinen (deceased 12/28/97)," were duly licensed to practice medicine in the state of Ohio.

{¶ 7} Meanwhile, without appellee's knowledge, Drs. Mervart and West were engaged in negotiations to sell the practice to the Cleveland Clinic Foundation. According to Dr. Mervart, however, they were advised by an attorney not to dispose of the Association's assets. Whether and to what extent the corporate assets actually came under the ownership or control of the Cleveland Clinic is a source of contention between the parties. In any event, Drs. Mervart and West each withdrew a $20,000 year-end bonus from the Association in November 1998 and then entered into employment with the Cleveland Clinic on December 1, 1998. At that point, Drs. Mervart and West ceased performing services for the Association, which no longer had any employees, and leased the Association's offices and equipment to the Cleveland Clinic. The Association was not liquidated, however, and Drs. Mervart and West continued to draw a salary from the Association as well as from the Cleveland Clinic.

{¶ 8} On March 26, 1999, appellee filed a complaint against the Association and Drs. Mervart and West seeking an equitable accounting and a constructive trust, as well as damages for conversion and on account. The complaint was later amended to add a claim for breach of fiduciary duty against Drs. Mervart and West. The gravamen of the complaint is that "[t]he [Association], Dr. Mervart and Dr. West have refused to make any payment to the Estate for Dr. Lehtinen's shareholder and creditor interest and have converted and utilized * * * all of the assets of the [Association] for their own financial gain and benefit to the exclusion of, and without remuneration to, the Plaintiff."

{¶ 9} In June 2000, the Association and Drs. Mervart and West filed motions for summary judgment as to all counts of appellee's amended complaint. They argued that appellee lacks standing to bring this action because, as a nonprofessional, she is statutorily precluded from owning shares in a professional association. In support, appellants relied on R.C. 1785.07, which permits a shareholder

of a professional association to sell or transfer his or her shares only to another member of the same profession.

{¶ 10}  On January 4, 2001, the trial court granted appellants' motions for summary judgment, finding only that "no genuine issue of material fact remains as to [plaintiff's] claims, and that the corporation and the individual doctors are each entitled to summary judgment as a matter of law."

{¶ 11}  In reversing the judgment of the trial court, the court of appeals essentially found that a decedent's title to shares of stock in a professional association passes by law to his or her estate's personal representative and that R.C. 1785.07's restriction on the disposition of shares applies only to voluntary transfers and not to transfers by operation of law.

{¶ 12}  The cause is now before this court pursuant to the allowance of a discretionary appeal.

{¶ 13}  The sole issue presented for our review is whether R.C. 1785.07 precludes a personal representative from acquiring and holding title to the decedent's shares in a professional association pending administration of the estate when the personal representative is not a member of the profession.[1]

{¶ 14}  By way of background, Ohio professionals were traditionally prohibited from practicing in the corporate form.  See *Land Title Abstract & Trust Co. v. Dworken* (1934), 129 Ohio St. 23, 31, 1 O.O. 313, 193 N.E. 650.  Consequently, they were denied the various tax and business advantages that usually inure from incorporation.  The Professional Association Act, R.C. Chapter 1785, effective October 17, 1961, "was passed simply and solely to enable the self-employed professional person to share in some of the many tax benefits long afforded to employees of nonprofessional enterprises, particularly in the tax bonanza of qualified pension and profit-sharing plans."  2 Cavitch, Ohio Corporation Law (2002) 18–2, Section 18.1.  See, also, Vesely, The Ohio Professional Association Law (1962), 13 W.Res.L.Rev. 195.

---

1.  Although not mentioned by the parties, we sua sponte address whether the trial court's entry of summary judgment constitutes a final appealable order.  Along with its answers to appellee's complaint and amended complaint, appellant Association filed certain counterclaims that were never formally adjudicated or dismissed.  While the trial court's entry of summary judgment purports to be "final," it does not specifically determine that "there is no just reason for delay."  Civ.R. 54(B).  Nevertheless, these counterclaims seek only the dismissal of appellee's complaint and declaratory judgment on matters that are mooted by the entry of summary judgment.  In *Gen. Acc. Ins. Co. v. Ins. Co. of N. Am.* (1989), 44 Ohio St.3d 17, 21, 540 N.E.2d 266, we explained that "even though all the claims or parties are not expressly adjudicated by the trial court, if the effect of the judgment as to some of the claims is to render moot the remaining claims or parties, then compliance with Civ.R. 54(B) is not required to make the judgment final and appealable."  Accordingly, this court has jurisdiction to determine the cause.

{¶ 15} However, while the General Assembly was willing to provide the authority to enable Ohio professionals to obtain the benefits of corporate treatment under the Internal Revenue Code, it was not willing to endow the professional association with all of the attributes of a general corporation. Instead, a professional association organized under R.C. Chapter 1785 is "subject to numerous restrictions presumably intended to protect the public against the possibility of having unlicensed persons provide professional services, either indirectly by controlling professional corporations as shareholders or directors, or directly as employees of professional corporations." Smith, Professional Corporations in Ohio: The Time for Statutory Revision (1969), 30 Ohio St.L.J. 439, 443.

{¶ 16} Accordingly, R.C. 1785.07 provides:

{¶ 17} "A shareholder of a professional association may sell or transfer that shareholder's shares in the association only to another individual who is duly licensed, certificated, or otherwise legally authorized to render within this state the same professional service as that for which the association was organized * * *."

{¶ 18} While R.C. 1785.07 clearly prohibits a shareholder of a professional association from transferring his or her shares to a nonprofessional, the statute is silent with respect to transfers by operation of law, such as upon a shareholder's death. As explained by Smith, supra, 30 Ohio St.L.J. at 452:

{¶ 19} "While the statute presents a number of problems for voluntary transfers, at least the shareholder can refrain from making the transfers. However, there are a number of circumstances in which transfers must be made, such as the death or disqualification of a shareholder. The statute's silence on these points raises serious problems."

{¶ 20} In particular, "[t]he shares of a corporation are personal property," R.C. 1701.24(A), and "[t]he title to personal property of a deceased person passes to his personal representative, his executor or administrator, pending the settlement of the estate, whether he dies testate or intestate." *Winters Natl. Bank & Trust Co. v. Riffe* (1965), 2 Ohio St.2d 72, 31 O.O.2d 56, 206 N.E.2d 212, paragraph one of the syllabus. Thus, unlike a beneficiary or specific legatee, "an executor's title to stock in an estate is acquired by operation of law." 18 Corpus Juris Secundum (1990) 511, Corporations, Section 220.

{¶ 21} There is some surface plausibility to appellants' argument that had the General Assembly intended to limit the transfer restrictions of R.C. 1785.07 to voluntary transfers or to make an exception for transfers by operation of law, it would have followed the approach taken by some other state legislatures and specifically included a provision to that effect. For example, Utah's professional corporation act provides:

{¶ 22} "[A] shareholder may *voluntarily* transfer shares of capital stock in a professional corporation only to:

{¶ 23} "(a) persons who are duly licensed to render the same specific professional services as those for which the corporation was organized." (Emphasis added.) Utah Code Ann. 16–11–7. See *Riche v. N. Ogden Professional Corp.* (Utah App.1988), 763 P.2d 1210, 1213, affirmed (1989), 784 P.2d 1126.

{¶ 24} More directly, Michigan's act provides that "[s]hares of a corporation organized under this act shall not be sold or transferred except to an individual who is eligible to be a shareholder of the corporation *or to the personal representative or estate of a deceased or legally incompetent shareholder.*" (Emphasis added.) Mich.Comp.Laws Ann. 450.230. See Smith, supra, 30 Ohio St.L.J. at 452–453. And New York's Business Corporation Law, Section 1511, specifically provides that "[n]othing herein contained shall be construed to prohibit the transfer of shares by operation of law or by court decree." See *Udel v. Udel* (1975), 82 Misc.2d 882, 884, 370 N.Y.S.2d 426.

{¶ 25} The force of appellants' argument, however, dissipates upon closer analysis. Absent a provision to the contrary, restrictions on the transfer of corporate shares of stock, whether contained in the articles of incorporation, bylaws, or in a separate agreement among the shareholders, are overwhelmingly held to apply only to voluntary transfers and not to transfers by operation of law. *Durkee v. Durkee–Mower, Inc.* (1981), 384 Mass. 628, 428 N.E.2d 139; *Castonguay v. Castonguay* (Minn.1981), 306 N.W.2d 143. Thus, while there is some disagreement as to whether restrictions on the transfer of shares should apply to subsequent transfers by an executor to specific legatees or to others, there is no disagreement that title to the decedent's shares initially passes to the estate's personal representative notwithstanding the restriction. See *Colbert v. Hennessey* (1966), 351 Mass. 131, 140, 217 N.E.2d 914; *In re Trilling & Montague* (E.D.Pa.1956), 140 F.Supp. 260; *Boston Safe Deposit & Trust Co. v. N. Attleborough Chapter of Am. Red Cross* (1953), 330 Mass. 114, 111 N.E.2d 447; *Stern v. Stern* (C.A.D.C.1945), 146 F.2d 870; 18A American Jurisprudence 2d (1985) 572–573, Corporations, Section 694; 18 Corpus Juris Secundum, supra, Corporations, Section 220 et seq.; Annotation, Restrictions on Transfer of Corporate Stock as Applicable to Testamentary Dispositions Thereof (1975), 61 A.L.R.3d 1090, 1094, Section 4.

{¶ 26} Under these same principles, the court in *Riche*, supra, held that certain restrictive provisions appearing in a medical association's articles of incorporation and stock-redemption agreement, which prohibited the transfer of shares to persons who are not licensed to render medical services, did not preclude the shares of a bankrupt shareholder from being transferred to an unlicensed creditor pursuant to a court-ordered trustee's sale. While the Utah

statute referred to above puts a transfer restriction on only voluntary transfers of shares, the corporation's restrictions in *Riche* were not expressly limited to voluntary transfers.

{¶ 27} In considering the applicability of these transfer restrictions, the court in *Riche* explained:

{¶ 28} "Although the statute, the articles, and the agreement prohibit the transfer of stock to anyone who is not a member of the medical profession, these prohibitions did not preclude the transfer in this case. Restrictions on the sale of corporate stock are held to apply only to 'voluntary' transfers. *See, e.g., Castonguay v. Castonguay*, 306 N.W.2d 143, 145 (Minn.1981) (stock restrictions did not apply to court-ordered assignment pursuant to judgment of divorce). Indeed, this doctrine has apparently been incorporated in [Utah Code Ann.] § 16–11–7, quoted above, which expressly refers only to voluntary transfers.

{¶ 29} "The same result is reached in this case by giving the corporation's stock repurchase agreement its plain meaning. The agreement does not even purport to restrict involuntary transfers of stock, such as the one in the instant case which occurred pursuant to a court-ordered trustee's sale. *See Durkee v. Durkee–Mower, Inc.*, 384 Mass. 628, 428 N.E.2d 139, 142 (1981)." Id., 763 P.2d at 1213.

{¶ 30} Appellants would have us distinguish all of the foregoing cases on the basis that they involve either "restrictive stock agreements" or statutes that "expressly distinguish between 'voluntary' and 'involuntary' transfers." Appellants, however, have offered no authority for making such distinctions. On the other hand, courts have held that restrictive statutory provisions equivalent to R.C. 1785.07 do *not* encompass transfers by operation of law.

{¶ 31} Thus, in *Street v. Sugerman* (Fla.1967), 202 So.2d 749, the Supreme Court of Florida held that Fla.Stat. 621.09 and 621.11 do not preclude a nonprofessional judgment creditor from levying upon shares of stock in a professional service corporation and having them sold to satisfy the judgment. Fla.Stat. 621.09 provides that "[n]o corporation organized under the provisions of this act may issue any of its capital stock to anyone other than * * * an individual who is duly licensed * * * to render the same specific professional services as those for which the corporation was incorporated." Fla.Stat. 621.11 provides that "[n]o shareholder of a corporation organized under this act may sell or transfer her or his shares in such corporation except to another * * * individual [who is] eligible to be a shareholder of such corporation."

{¶ 32} The Florida Supreme Court agreed with the district court of appeals that these provisions do not prevent an execution *by law* and explained:

{¶ 33}  "We noted in the case of *In re The Florida Bar*, Fla., 133 So.2d 554, 4 A.L.R.3d 375, that professional service corporations evolved and were designed primarily for the purpose of allowing various professions, not previously privileged to incorporate, to form organizations that would legitimately qualify for certain tax or retirement advantages available to corporations.  The privilege of incorporation was most definitely not created or extended in order that those availing themselves of the benefits could be cloaked with an immunity inimical to legal order and public interest.  Thus, it is our judgment that Chapter 621, Florida Statutes, F.S.A., does not serve to prevent an execution and sale, by law, of shares of stock in a professional service corporation for satisfaction of a judgment creditor."  Id., 202 So.2d at 751.

{¶ 34}  A similar conclusion was reached in *Gulf Mtge. & Realty Invest. v. Alten* (1980), 282 Pa.Super. 230, 422 A.2d 1090, where a judgment creditor sought to execute upon shares of stock in a Pennsylvania professional corporation.  The Pennsylvania Professional Corporation Act provides that "owners of shares in a professional corporation shall be licensed persons and any issuance or transfer of shares in violation of this restriction shall be void."  15 Pa.Cons.Stat.Ann. 2923 (derived from 15 Pa.Stat. 2911[a] ).  The court explained:

{¶ 35}  "Although the Act may prevent unlicensed persons from exercising control of shares obtained by judicial sale, it does not prevent the shares from being seized and sold to licensed persons or back to the corporation, or otherwise disposed of upon dissolution of the corporation."  Id., 282 Pa.Super. at 239, 422 A.2d 1090.

{¶ 36}  Similar results have been obtained under comparable statutes in cases involving claims for spousal or child support.  See *Brody v. Poliakoff* (Fla.App. 1997), 689 So.2d 441; *El–Amin v. Adams* (May 16, 1995), Va.App. No. 0292–94–2, 1995 WL 293043.

{¶ 37}  Nevertheless, appellants would distinguish these cases on the basis that they involve "involuntary transfers to satisfy debts."  According to appellants, in the present case "a professional voluntarily sought to transfer his shares to his non-professional wife.  Thus, the transfer at issue is not an involuntary transfer to a non-professional judgment creditor, but rather a voluntary transfer to a non-professional spouse."

{¶ 38}  Appellants' argument in this regard is, in fact, a variation on the consistent but misguided theme, interwoven throughout their briefs, that because Dr. Lehtinen died testate, "the shares transferred pursuant to [his] will, not by 'operation of law.' "  Appellee brought this action in her capacity as the personal representative of Dr. Lehtinen's estate, and whatever rights of inheritance she may have to his personal property as a beneficiary under his will are irrelevant to these proceedings.  Title to Dr. Lehtinen's shares vested in appellee upon her

appointment as executor and passed to her by operation of law irrespective of any specific bequest. See *Riffe,* supra, 2 Ohio St.2d at 77, 31 O.O.2d 56, 206 N.E.2d 212; 18 Corpus Juris Secundum, supra, at 511, Corporations, Section 220; Annotation, supra, 61 A.L.R.3d at 1094–1095, Section 4.

{¶ 39} Finally, appellants contend that "[b]y allowing professionals to bequeath their shares to non-professionals, the Court of Appeals opens the door to non-professional control of professional associations organized under R.C. Chapter 1785." Appellants argue that professional associations will now be faced with a number of issues, "such as whether the non-professional executrix or heir must be given notice of shareholder's meetings, whether he or she may vote at the meetings, and whether he or she is entitled to receive dividends on the shares." Appellants also argue that while such an event may eventually prompt the Secretary of State to cancel the association's charter pursuant to R.C. 1785.06, there could still be "a window of opportunity during which a non-professional can exercise control," since the certification is made on an annual basis. Besides, appellants continue, "[e]ven if the cancellation process were an effective safeguard [against nonprofessional influence], * * * professional associations still would face cancellation of their charters and the disruption and burdens that entails." In appellants' view, professional associations should not be forced to endure these burdens "merely because a shareholder died." We disagree.

{¶ 40} "Once a disqualified person * * * acquires stock [in a professional corporation] by an involuntary transfer, the usual remedy is to compel dissolution of the corporation pursuant to the applicable statute." *Riche,* supra, 763 P.2d at 1214. In other words, when a nonprofessional obtains control of shares of a professional corporation by operation of law, "the corporation could be dissolved and thus prevent noncompliance with statutory restrictions." *Alten,* supra, 282 Pa.Super. at 241, 422 A.2d 1090. This would obviate the issue of control and effectively deal with any problem associated with "the scope of the rights of a nonprofessional in such a stock interest." *Sugerman,* supra, 202 So.2d at 751. And since nothing in R.C. Chapter 1785 precludes a professional association from being dissolved voluntarily, see R.C. 1701.86 and 1785.08, there need not be any "window of opportunity during which a non-professional can exercise control."

{¶ 41} Moreover, most, if not all, of these problems, including dissolution and reincorporation, can be avoided by providing for the consequences of a shareholder's death in the association's articles of incorporation or in a separate "buy-sell" or share-purchase agreement. See 2 Cavitch, Ohio Corporation Law, supra, at 18–8 to 18–9, Section 18.34; Anderson's Ohio Corporation Law (2000) 375–376, Section 16.25; M. Thomas Arnold, Incorporation of Professionals in Ohio: Past, Present, and Future (1981), 15 Akron L.Rev. 191, 208–209; Smith, supra, 30 Ohio St.L.J. at 451–452; Vesely, supra, 13 W.Res.L.Rev. at 199–200. In any event, we

find nothing in the statute to indicate that the General Assembly sought to ensure the continuity of the corporate form under these circumstances.

{¶ 42} Thus, it is our judgment that if the General Assembly had intended to require that a personal representative be professionally qualified in order to acquire title to the decedent's shares in a professional association organized under R.C. Chapter 1785, it would have included a specific provision to that effect.

{¶ 43} Accordingly, we hold that R.C. 1785.07, which permits a shareholder of a professional association to sell or transfer his or her shares only to another individual who is a member of the same profession, does not preclude a personal representative who is not a member of the profession from acquiring and holding title to the decedent's shares in a professional association pending administration of the estate.

{¶ 44} We stress, however, that since this holding is based on the theory that title to a decedent's shares vests in his or her estate's personal representative by operation of law, it does not encompass the distinct issue of whether R.C. 1785.07 prohibits any further transfers by the personal representative to nonprofessional heirs or legatees or to others not professionally qualified.

{¶ 45} For all of the foregoing reasons, the judgment of the court of appeals is affirmed, and the cause is remanded to the trial court for further proceedings.

Judgment affirmed<br>and cause remanded.

MOYER, C.J., F.E. SWEENEY, PFEIFER, BATCHELDER, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

WILLIAM G. BATCHELDER, J., of the Ninth Appellate District, sitting for COOK, J.

---

Shannon C. Strachan, Neil McGinness and Hal D. Cooper, for appellee.

McDonald, Hopkins, Burke & Haber Co., L.P.A., and Dan L. Makee, for appellants Dr. Michael Mervart and Dr. Michael West.

Moscarino & Treu, L.L.P., George M. Moscarino, Edward S. Jerse and Michael L. Golding, for appellant Drs. Lehtinen, Mervart and West, Inc.

Porter, Wright, Morris & Arthur, L.L.P., Patricia F. Jacobson and Hugh E. McKay; and Eugene P. Whetzel, urging affirmance for amicus curiae Ohio State Bar Association.